IN THE COURT OF APPEALS OF NORTH CAROLINA

 [do not modify this line]

 No. COA21-375

 Filed: [do not modify this line]

 Buncombe County, Nos. 17 CRS 83204, 17 CRS 83209, 17 CRS 83792

 STATE OF NORTH CAROLINA,

 v.

 TIMOTHY ROBERT GALLION.

 Appeal by defendant from judgment entered 11 February 2020 by Judge Carla

 Archie in Buncombe County Superior Court. Heard in the Court of Appeals 14

 December 2021.

 Attorney General Joshua H. Stein, by Special Deputy Attorney General Robert
 C. Montgomery and Special Deputy Attorney General Daniel P. O’Brien, for the
 State.

 William D. Spence for Defendant-Appellant.

 CARPENTER, Judge.

¶1 Defendant appeals from judgment after a jury convicted him of first degree

 murder, possession of a firearm by a felon, and driving while impaired. After careful

 review of the record, we find no error.

 I. Factual & Procedural Background

¶2 The State’s evidence presented at trial tends to show the following: Defendant’s

 wife, Ms. Gallion, testified that on 22 March 2017, Defendant made the following
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 statement to her: “I’m going to kill your mother, I’m going to kill your sister, and I’m

 going to kill everybody that knows you, and then I’ll kill you.” Ms. Gallion further

 testified that on the same day Defendant communicated the threats, she took out a

 warrant for his arrest.

¶3 At around 3:46 p.m. that day, officers of the Buncombe County Sheriff’s

 Department were dispatched to Defendant’s home to arrest him. The officers

 attempted to contact Defendant or Ms. Gallion but could locate neither of them on

 the property. They observed through the window of a workshop on Defendant’s

 property “a handful of bullets on a shelf.”

¶4 Sergeant Nathan Ball (“Sergeant Ball”) of the Buncombe County Sheriff’s

 Office oversaw the department’s Community Enforcement Team, which handles

 community complaints including warrant services. He testified his team responded

 to the call to Defendant’s home. Upon Sergeant Ball learning from his team

 Defendant was not at the residence, he went to the nearby intersection of Wittemore

 Branch Road and Barnardsville Highway, where Defendant might cross if he were to

 return home. As he was talking with his colleague Captain Elkins regarding the

 matter, they heard a dispatch for the fire department regarding a structure fire on

 Dillingham Road.

¶5 Sergeant Ball headed to the area of the fire, as he knew Defendant “had a

 previous address on Dillingham Road.” On his way there, Sergeant Ball saw someone

 -2-
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 getting into a green Dodge pickup truck, matching the description of Defendant’s

 vehicle, parked beside Sheena’s Restaurant. Sergeant Ball dispatched other

 members of his team to the location. The officers left Defendant’s home, heading in

 the direction of the restaurant. Sergeant Ball knew Defendant was a convicted felon.

¶6 At around the same time that afternoon, Defendant went to the property of

 Tommy Carson (“Carson”), the uncle of Defendant’s former wife, at 397 Dillingham

 Road where Carson’s house is located and where Carson used to operate a grocery

 store. Carson testified Defendant approached and first asked him for beer or wine,

 but when Carson did not have these items, Defendant asked to borrow ten dollars.

 After Carson responded he did not have any money either, Defendant showed him his

 “bulletproof” jacket with a Buncombe County Sheriff’s Office SWAT team patch

 affixed to an arm and a “9 millimeter Uzi” firearm.

¶7 Carson advised he was heading out but could pick up money for Defendant at

 the bank if Defendant wanted to follow him there. Defendant declined the offer

 telling Carson, “he had to go up the road to take care of some business.” Carson

 witnessed Defendant get in his truck and go up the road. Carson drove away with

 Brooke Blagg (“Blagg”) who lived on his property. Defendant ultimately left Carson’s

 property shortly after Carson at 4:24 p.m. At 4:31 p.m. a call came into the fire

 department regarding a fire in Carson’s building. Defendant stated in an interview

 with investigators on 23 March 2017 that he headed over to Sheena’s Restaurant

 -3-
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 after leaving Carson’s house. According to Defendant, he asked the owner of the

 restaurant for twenty dollars, then went home. He also admitted to drinking six

 beers and “maybe four” Johny Bootlegger spirited beverages on 22 March 2017.

¶8 Blagg saw Defendant on Carson’s property on 22 March 2017 and testified she

 and Carson “left the store and [Defendant] went up to the church and turned around

 and came back down” to Carson’s property. She confirmed she saw Defendant leave

 the store and drive towards the house of Bobby Pegg (“Pegg’”), the victim. She added,

 “because right past the church [on Dillingham Road] is where [Defendant] had lived

 at with [Pegg].” “The church . . . it’s going in the direction” of Pegg’s house.

¶9 Officers located Defendant traveling on Barnardsville Highway and followed

 him after he turned on Wittemore Branch Road. Defendant did not stop his vehicle

 when two police cars pursued him with blue lights and sirens activated.

¶ 10 Officers eventually stopped Defendant via a roadblock. They approached his

 vehicle with guns drawn and removed Defendant from the vehicle after he refused to

 show his hands. In Defendant’s vehicle, officers found two firearms in plain view.

 The officers also observed “blood on the steering wheel, on a door, [and on] the driver’s

 seat.” Officers arrested Defendant at approximately 4:43 p.m. and took inventory of

 his truck. They recovered firearms including a Ruger 9-millimeter “shotgun” and a

 Cobray 9-millimeter pistol as well as three 9-millimeter magazines, one 9-millimeter

 flash suppressor, and 9-millimeter ammunition. The 9-millimeter ammunition

 -4-
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 included “silver-colored casings with the headstamp of FC LUGER 9 MM.” Officers

 performed a pat down of Defendant and located a GPS monitoring device on his left

 ankle. They also “noticed a strong odor of alcohol” coming from Defendant’s person.

 Defendant was transported to a detention center where he refused to perform an

 alcohol breath test; his blood was drawn for analysis pursuant to a search warrant.

¶ 11 Deputy Leslie Meade (“Deputy Meade”) of the Buncombe County Sheriff’s

 Department performed standardized field sobriety tests on Defendant. Deputy

 Meade testified Defendant showed six of six clues on the horizontal gaze nystagmus

 (“HGN”) test, and seven of eight clues on the walk and turn test. Defendant refused

 to complete the one-legged stand test.

¶ 12 At approximately 2:00 p.m. the following day—23 March 2017—Pegg’s niece,

 Summer Riddle (“Riddle”) and his mother, Jeanette Pegg, arrived at Pegg’s house on

 665 Dillingham Road to check on him after they had not heard from him since 21

 March 2017. Defendant’s brother owned the house where Pegg lived, and Defendant

 had performed carpentry work and repairs on the house.

¶ 13 Pegg was last seen alive on 22 March 2017 at about 1:00 p.m. by his neighbor

 who witnessed Pegg standing in his driveway. Riddle and Jeanette Pegg found Pegg’s

 deceased body sitting on the couch in the living room. Riddle testified the kitchen

 door was unlocked when she arrived at the house, and it was normal for Pegg to leave

 the house unlocked when he was home. Riddle and Jeanette Pegg called 911 within

 -5-
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 minutes of arriving on the scene. Law enforcement responded to the 911 call and

 initiated a homicide investigation. Officers found silver-colored shell casings with

 the headstamp “FC LUGER 9 MM,” matching the description of the bullets found in

 Defendant’s vehicle, around Pegg’s body.

¶ 14 An autopsy revealed Pegg died from gunshot wounds to his head, although an

 exact date or time of death could not be determined from the examination. The

 autopsy report shows Pegg had three gunshot wounds to his head. Two of the wounds

 had “soot and stippling” around them, indicating the muzzle of the gun was close to

 Pegg when fired. The third wound did not have soot or stippling, indicating the gun

 was fired at an “indeterminate range” from the deceased.

¶ 15 On 29 January 2020, Defendant filed a pretrial motion to suppress any

 evidence seized during the search of his home address on the basis the search warrant

 affidavit “fails to implicate the premises,” as required by N.C. Gen. Stat. § 15A-244,

 the North Carolina Constitution, and the United States Constitution. Defendant also

 moved to suppress evidence of GPS data on the grounds his statutory rights were

 violated when privileged information, namely GPS data of his movements, was orally

 provided by the North Carolina Department of Public Safety (‘DPS”) to law

 enforcement before a court order was issued. On 3 February 2020, the trial court

 heard Defendant’s motion to suppress and orally announced its findings of facts and

 conclusions of law in open court. The trial court concluded there had been no

 -6-
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 substantial violation of Chapter 15A that warranted suppression and denied

 Defendant’s motion.

¶ 16 A jury trial began on 3 February 2020 before the Honorable Carla Archie in

 Buncombe County Superior Court. Defendant admitted to having been previously

 convicted of three charges of driving while impaired, resulting in a conviction of

 habitual driving while impaired.

¶ 17 At trial, Alyssa Tinnin (“Tinnin”) was tendered by the State as an expert in the

 field of forensic toxicology. Tinnin testified she conducted a chemical analysis on the

 blood sample identified as that taken from Defendant. Tinnin opined Defendant’s

 blood sample contained 0.17 grams of alcohol per 100 milliliters.

¶ 18 Elizabeth Wilson (“Wilson”), is a firearms examiner who, at the time of the

 hearing, was employed by the North Carolina State Crime Laboratory. Wilson was

 tendered as an expert in the area of firearms identification and examination. Wilson

 testified that she performs all tests on firearms based on reliable facts and data. She

 examined the Cobray 9-millimeter and Ruger 9-millimeter firearms seized from

 Defendant’s vehicle. Wilson also did comparison examinations of the shell casings,

 bullets, and projectiles that were collected from the homicide crime scene. Based on

 the results of her examination, Wilson concluded that seven shell casings found

 around Pegg’s’ body, the “caliber .38 class fired copper jacket” fragment that was

 imbedded in wood at Pegg’s home, the “caliber .38 class fired copper jacket” collected

 -7-
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 from Pegg’s temple, and the “caliber .38 class fired jacketed bullet” collected from

 Pegg’s jaw were all fired from the same Cobray 9-millimer pistol seized from

 Defendant.

¶ 19 On 27 March 2017 at approximately 1:58 p.m., Sergeant Ryan Jordan

 (“Sergeant Jordan”) of the Buncombe County Sheriff’s Department obtained a search

 warrant for Defendant’s GPS monitoring data obtained from Defendant’s previously

 mandated post-release electronic monitoring device. The search warrant was

 executed at 2:13 p.m. that afternoon. Sergeant Jordan testified he obtained the

 information sought in the search warrant from Joan McCurry (“McCurry”), the Chief

 Probation and Parole Officer for DPS, approximately three days after he executed the

 search warrant.

¶ 20 At trial, McCurry testified regarding the GPS communication device

 Defendant was wearing and the business records created from such a device.

 McCurry testified at the suppression hearing she verbally provided Defendant’s GPS

 data pinpoints for the date of 22 March 2017 to Captain Elkins and Sergeant Jordan

 upon their request and before a search warrant was issued.

¶ 21 Michelle Wilson, an account manager for BI Incorporated, also testified. BI

 Incorporated contracted with the Department of Public Safety of the State of North

 Carolina to provide an electronic curfew monitoring service that the State uses for its

 adult probation and parole section. Michelle Wilson explained that due to

 -8-
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 atmospheric conditions, GPS points could drift but depending on how many satellites

 are tracking at a given time, the GPS data is generally accurate within a range of 25

 to 100 feet. She testified the GPS data for Defendant showed Defendant was at the

 address of 665 Dillingham Road, Pegg’s home, at 4:07 p.m. on 22 March 2017. The

 State also offered evidence through Michelle Wilson tending to show Defendant was

 at Pegg’s home between the hours of 3:00 p.m. to 4:22 p.m. on 22 March 2017.

¶ 22 A search warrant for Defendant’s home was issued on 27 March 2017 at

 approximately 7:59 p.m. and was executed that evening at 8:29 p.m. Officers seized

 9-millimeter ammunition with the headstamp “FC LUGER 9 MM” from inside

 Defendant’s workshop and seized ammunition, handwritten notes, and numerous

 firearms from Defendant’s home.

¶ 23 On 22 March 2017, Defendant was charged with driving while impaired,

 driving while license revoked for impaired driving, possession of a firearm by a felon,

 second degree arson, and first degree murder. On 7 August 2017, a Buncombe County

 grand jury indicted Defendant on the charges of driving while licensed revoked, in

 violation of N.C. Gen. Stat. § 20-28(a1); habitual impaired driving, in violation of N.C.

 Gen. Stat. § 20-138.5; possession of a firearm by a felon, in violation of N.C. Gen. Stat.

 § 14.415.1; second degree arson, in violation of N.C. Gen. Stat. § 14-58; and first

 degree murder, in violation of N.C. Gen. Stat. § 14-17.

¶ 24 At the close of the State’s evidence, Defendant moved to dismiss the charges of

 -9-
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 second degree arson and first degree murder based on insufficiency of evidence. The

 trial court denied his motion. Defendant renewed his motion to dismiss at the close

 of all evidence, which was also denied. On 11 February 2020, the State dismissed the

 charge of driving while licensed revoked. On the same day, the jury found Defendant

 guilty of driving while impaired, possession of a firearm by a felon, and first degree

 murder; the jury found Defendant not guilty of second degree murder. Defendant

 gave oral notice of appeal in open court.

 II. Jurisdiction

¶ 25 This Court has jurisdiction to address Defendant’s appeal from a final

 judgment pursuant to N.C. Gen. Stat. § 7A-27(b)(1) (2021) and N.C. Gen. Stat. § 15A-

 1444(a) (2021).

 III. Issues

¶ 26 The issues before this Court are whether: (1) probable cause existed for the

 magistrate to issue the search warrant for Defendant’s residence; (2) the findings of

 fact are supported by competent evidence and whether the findings of fact in turn

 support the conclusions of law in the trial court’s ruling on Defendant’s motion to

 suppress evidence seized from his residence; (3) the trial court committed plain error

 in refusing to suppress electronic monitoring data where the Secretary of DPS

 allowed Defendant’s GPS data to be orally released before a search warrant was

 issued; (4) the trial court erred by refusing to allow Defendant to cross-examine a

 - 10 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 witness about a Facebook message; (5) the trial court committed plain error by

 admitting testimony on firearms identification and examination from the State’s

 expert witness; and (6) the trial court erred by denying Defendant’s motion to dismiss

 the first degree murder charge.

 IV. Motion to Suppress Evidence Obtained from Defendant’s Residence

¶ 27 In his first argument, Defendant challenges the sufficiency of the search

 warrant application for his residence as well as the trial court’s denial of his motion

 to suppress all evidence seized through a search warrant of this address.

 A. Sufficiency of the Search Warrant Application

¶ 28 We first consider Defendant’s argument that the search warrant affidavit is

 defective because it fails to implicate his home address and does not provide a basis

 to support probable cause.

¶ 29 The Fourth Amendment to the Constitution of the United States, made

 applicable to the states through the Fourteenth Amendment, protects “[t]he right of

 the people to be secure in their persons, houses, papers, and effects, against

 unreasonable searches and seizures . . . .” U.S. Const. amends. IV, XIV. Under the

 Fourth Amendment, a search warrant may be issued only “upon probable cause,

 supported by [o]ath or affirmation, and particularly describing the place to be

 searched, and the persons or things to be seized.” U.S. Const. amend. IV.

¶ 30 “Article I, Section 20 of the Constitution of North Carolina likewise prohibits

 - 11 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 unreasonable searches and seizures and requires that warrants be issued only on

 probable cause,” although the language of the North Carolina Constitution differs

 from that of the United States Constitution. State v. Allman, 369 N.C. 292, 293, 794

 S.E.2d 301, 302–03 (2016); see N.C. Const. art. I, § 20; see also N.C Gen. Stat. § 15A-

 245 (2021).

¶ 31 The North Carolina Supreme Court adopted the “totality of the circumstances

 test to determine whether probable cause exists under Article I, Section 20” of the

 North Carolina Constitution. Allman, 369 N.C. at 293, 794 S.E.2d at 303. “Our case

 law makes clear that when an officer seeks a warrant to search a residence, the facts

 set out in the supporting affidavit must show some connection or nexus linking the

 residence to illegal activity. Such a connection need not be direct, but it cannot be

 purely conclusory.” State v. Bailey, 374 N.C. 332, 335, 841 S.E.2d 277, 280 (2020).

¶ 32 Under North Carolina law, an application for a search warrant must meet

 certain requirements, including that it “be made in writing upon oath or affirmation.”

 See N.C. Gen. Stat. § 15A-244 (2021). Additionally, each application must contain:

 (1) The name and title of the applicant; and
 (2) A statement that there is probable cause to believe
 that items subject to seizure under [N.C. Gen. Stat.
 §] 15A-242 may be found in or upon a designated or
 described place, vehicle, or person; and
 (3) Allegations of fact supporting the statement. The
 statements must be supported by one or more
 affidavits particularly setting forth the facts and
 circumstances establishing probable cause to believe

 - 12 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 that the items are in the places or in the possession
 of the individuals to be searched; and
 (4) A request that the court issue a search warrant
 directing a search for and the seizure of the items in
 question.

 N.C. Gen. Stat. § 15A-244(1)–(4).

¶ 33 A search warrant “affidavit is sufficient if it supplies reasonable cause to

 believe that the proposed search for evidence of the commission of the designated

 criminal offense will reveal the presence upon the described premises of the objects

 sought and that they will aid in the apprehension or conviction of the offender.” State

 v. Vestal, 278 N.C. 561, 575–76, 180 S.E.2d 755, 765 (1971) (citations omitted); see

 also N.C. Gen. Stat. § 15A-244. “A magistrate must make a practical, common-sense

 decision, based on the totality of the circumstances, whether there is a fair probability

 that contraband will be found in the place to be searched.” State v. McKinney, 368

 N.C. 161, 164, 775 S.E.2d 821, 824 (2015) (citations and internal quotation marks

 omitted). Additionally, “a magistrate is entitled to draw reasonable inferences from

 the material supplied to him by an applicant for a warrant.” State v. Sinapi, 359 N.C.

 394, 399, 610 S.E.2d 362, 365 (2005).

¶ 34 It is well-established that “great deference should be paid a magistrate’s

 determination of probable cause and . . . after-the-fact scrutiny should not take the

 form of a de novo review.” State v. Lewis, 372 N.C. 576, 584, 831 S.E.2d 37, 43 (2019)

 (citation omitted). “Instead, a reviewing court is responsible for ensuring that the

 - 13 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 issuing magistrate had a substantial basis for . . . conclud[ing] that probable cause

 existed.” McKinney, 368 N.C. at 165, 775 S.E.2d at 825 (citations and internal

 quotation marks omitted).

¶ 35 Here, Sergeant Jordan included with his application for a search warrant an

 affidavit stating his name and title, as well as the following statement regarding

 probable cause:

 Based on my training and experience, and the facts as set
 forth in this affidavit, I believe that in records in and
 around the residence, outbuildings, and curtilage of
 [Defendant’s residence] in Barnardsville, NC there exists
 evidence of a crime and contraband or fruits of that crime.

¶ 36 After reciting his training and experience in the affidavit, Sergeant Jordan

 made the following allegations of fact to support his statement of probable cause:

 (1) On 3-23-2017, the Buncombe County Emergency
 Operations Center received a call on 911 stating that
 an individual had been discovered with an apparent
 gunshot [wound] at 665 Dillingham Rd,
 Barnardsville, NC. First Responders arrived on
 scene and located Bobby Ray Pegg II deceased in his
 home. Detectives with the Buncombe County
 Sheriff’s Office (BCSO) responded to the residence
 and began conducting an investigation.
 (2) During the investigation, detectives located several
 silver colored spent 9mm shell casings in the area
 around Pegg’s body. All the silver colored spent
 9mm shell casings were head stamped with “F C
 LUGER 9MM.”
 (3) Detectives discovered the last time Pegg had been
 seen alive, was on 3-22-2017 at approximately 12:30
 p.m.

 - 14 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

(4) On 3-22-2017 it was reported to the BCSO that
 throughout the day, Timothy Robert Gallion had
 been making threats to his family stating that he
 would kill them, kill any law enforcement that
 attempted to apprehend him, and then kill himself.
 An arrest warrant was obtained by family members
 for Communicating Threats.
(5) Deputies traveled to Gallion’s residence . . . on 03-
 22-17 to search for Gallion. While there, deputies
 went to a workshop just down the driveway from the
 residence. A deputy looked into the window to see if
 Gallion was in the workshop and observed a handful
 of bullets on a shelf.
(6) Gallion was located on Whittemore Branch Rd in
 Barnardsville, NC, driving a green 1996 Dodge Ram
 Pickup Truck, where he was arrested for his open
 warrants. Gallion was located at approximately
 4:43 pm on 3-22-2017. Whittemore Branch Rd is in
 close proximity to 665 Dillingham Rd.
(7) During the arrest, multiple firearms were seen in
 plain view in the 1996 Dodge Ram Pickup Truck.
 Two (2) of the firearms located in the pickup truck
 were 9mm pistols. Also located inside the truck,
 were multiple boxes of ammunition. All 9mm
 ammunition had silver colored shell casings with the
 head stamp of “F C LUGER 9MM.” This
 ammunition is similar to the spent shell casings
 located in the proximity of Pegg’s body.
(8) During the arrest, the arresting officers observed
 that Gallion was intoxicated. Gallion was
 subsequently charged with Driving While Impaired.
(9) During the inventory of the 1996 Dodge Ram
 Pickup, officers observed blood smears inside the
 vehicle on the steering wheel, driver’s seat, and
 interior portion of the driver’s side door. Gallion also
 had blood on his hands.
(10) Detectives interviewed a witness who stated that on
 3-22-2017, he spoke with Gallion at 456 Dillingham
 Rd. When asked about Adrian Gallion, Timothy

 - 15 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 Gallion’s brother, Timothy Gallion became upset
 and stated that he was angry for not being paid for
 work he had done on a home his brother owned. This
 residence is the home located at 665 Dillingham Rd,
 Barnardsville, NC where Pegg was found deceased
 on 3-23-2017.
 (11) The witness stated Gallion showed him a pistol
 during their conversation. The pistol matched the
 description of one of the 9mm pistols found in the
 green Dodge Ram Pickup truck when Gallion was
 arrested.
 (12) The witness stated that later in the conversation,
 Gallion pointed at a Buncombe County Sheriff’s
 Office patch affixed to his shirt and made the
 comment that the patch could get him out of trouble.
 At the time of Gallion’s arrest, he was wearing
 clothing with the Buncombe County Sheriff’s Office
 patch affixed to it.
 (13) The witness described Gallion as being intoxicated
 at the time of their conversation.
 (14) Detectives spoke with a separate witness who stated
 they observed Gallion driving in the direction of 665
 Dillingham Rd. The time was estimated to be at
 approximately 3:30 pm.
 (15) The affiant knows that Gallion was charged in an
 incident in 2012 involving the discharge of a firearm
 at another person, which resulted in a conviction.

¶ 37 Sergeant Jordan included in his description of items to be seized, inter alia,

 bloodstains, DNA evidence, weapons, ammunition, drugs, and drug paraphernalia.

¶ 38 Defendant points to State v. Campbell, 282 N.C. 125, 191 S.E.2d 752 (1972)

 and State v. Armstrong, 33 N.C. App. 52, 234 S.E.2d 197 (1977) to argue the trial

 court erroneously denied his motion to suppress because Sergeant Jordan’s affidavit

 “fail[s] to reveal any underlying facts or circumstances implicating the

 - 16 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 premises/outbuildings at [his residence] to any crime.” Specifically, Defendant

 contends “[n]othing connects the [allegation in the affidavit that there were] ‘bullets

 on a shelf’” in his workshop, to the bullets found in his truck or the bullet casings

 found near the homicide victim. We disagree.

¶ 39 In Campbell, officers sought a warrant to search the residence of suspected

 drug dealers for illegal drugs, but the search warrant did not state any underlying

 facts about the residence other than the suspects lived in the house. 282 N.C. at 130,

 191 S.E.2d at 756. Our Supreme Court held that the search warrant affidavit was

 “fatally defective” because it “did not provide a sufficient basis for a finding of

 probable cause to search the premises described in the warrant . . . .” Id. at 131–32,

 191 S.E.2d at 757. The Court reasoned that “nothing in the . . . affidavit affords a

 reasonable basis upon which the issuing magistrate could conclude that any illegal

 possession or sale of narcotic drugs had occurred, or was occurring, on the premises

 to be searched. Id. at 131, 191 S.E.2d at 757.

¶ 40 Similarly, in Armstrong, an officer received a warrant to search the residence

 of a suspect who was alleged to have participated in illegal sales of marijuana. 33

 N.C. App. at 55, 234 S.E.2d at 198. Our Court concluded that there was “no allegation

 [in the search warrant affidavit] that any marijuana was ever seen, kept, sold, or

 delivered” at the defendant’s residence. Id. at 55, 234 S.E.2d at 199.

¶ 41 Here, there is no direct evidence linking the “handful of bullets on a shelf” seen

 - 17 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 in Defendant’s workshop to the charge of first degree murder. See Bailey, 374 N.C.

 at 335, 841 S.E.2d 277 at 280. However, other facts alleged in the affidavit show

 “some connection or nexus” to link Defendant’s residence to the murder. See id. at

 335, 841 S.E.2d 277 at 280 (emphasis added). The allegations include: (1) Defendant

 was arrested and found with two 9-millimeter firearms in his truck; (2) the

 ammunition found in Defendant’s truck, following his arrest, was consistent with the

 shell casings found around the murder victim’s body; (3) there were blood smears

 inside of Defendant’s truck and on his hands when he was arrested; (4) Defendant

 was arrested near the scene of the crime; (5) Defendant made statements to a witness

 on the day he was arrested which implied he had motive to kill the victim, and

 Defendant showed the witness a pistol during the conversation; and (6) the pistol

 Defendant showed the witness matched the description of the firearm found in

 Defendant’s truck.

¶ 42 We conclude the allegations in Sergeant Jordan’s affidavit were sufficient to

 allow a magistrate to reasonably infer that evidence related to the murder such as

 weapons, ammunition, bloodstains, and DNA evidence could likely be found at

 Defendant’s residence and would aid in the apprehension or conviction of the

 offender. See Vestal, 278 N.C. at 575–76, 180 S.E.2d at 765; Sinapi, 359 N.C. at 399,

 610 S.E.2d at 365; see also State v. Rook, 304 N.C. 201, 221–22, 283 S.E.2d 732, 745

 (1981) (holding an affidavit clearly established probable cause to believe that a

 - 18 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 wooden club and bloody clothing constituted evidence of the crime being investigated,

 and that the items were probably located in the defendant’s home even though there

 was no direct evidence linking the crime to the home). Given the totality of the

 circumstances, “the issuing magistrate had a substantial basis for . . . conclud[ing]

 that probable cause existed” in this case. See McKinney, 368 N.C. at 165, 775 S.E.2d

 at 824–25.

 B. The Trial Court’s Findings of Fact & Conclusions of Law

¶ 43 Defendant next contends the evidence and record do not support the trial

 court’s finding of fact stating:

 [b]ased on Officer Jordan’s training and experience and
 facts uncovered as part of law enforcement’s investigation,
 he articulated as part of both search warrants items that
 he was looking for that were relevant to the investigation
 and that would aid in the apprehension or conviction of a
 suspect, namely the defendant.

 Moreover, Defendant contends that the remaining findings do not support the trial

 court’s conclusion of law finding sufficient probable cause for the issuance of the

 search warrant.

¶ 44 This Court’s review of a trial court’s decision on a motion to suppress “is strictly

 limited to determining whether the trial judge’s underlying findings of fact are

 supported by competent evidence, in which event they are conclusively binding on

 appeal, and whether those factual findings in turn support the judge’s ultimate

 - 19 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 conclusions of law.” State v. Cooke, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982).

¶ 45 Following the hearing on Defendant’s motion to suppress, the trial court ruled

 on the motion, announcing its findings of fact and conclusions of law in open court.

 The trial court made the following findings of fact:

 (1) On March the 23rd, 2017, Buncombe County
 Emergency Operations Center received a 911 call
 stating that an individual had been discovered with
 an apparent gunshot [wound] at 665 Dillingham
 Road.
 (2) First responders arrived on the scene and located
 Bobby Pegg deceased in his home. They also located
 several silver-colored spent 9 millimeter shell
 casings in the area around Pegg’s body.
 (3) The shell casing were headstamped with FC LUGER
 9 MM.
 (4) Officers uncovered that the defendant, Timothy
 Gallion, was making threats against his wife and
 that she or someone in the family took out warrants
 against the defendant for communicating threats.
 (5) He was stopped in a green pickup truck on March
 the 22nd, 2017, in close proximity to the scene of the
 murder.
 (6) He was served with the outstanding warrant for
 communicating threats. And as part of the search of
 the pickup truck, officers located two 9 millimeter
 pistols, as well as 9 millimeter ammunition with
 silver-colored shell casings and a headstamp of FC
 LUGER 9 MM. That ammunition was similar to the
 ammunition located near the homicide victim’s body.
 (7) Officers also found in the pickup truck blood smears
 on the steering wheel, driver’s seat, and interior
 portion of the driver’s side door. The defendant also
 had blood stains on his hands.
 (8) Officers talked to a witness who had a recent
 conversation with the defendant. The witness

 - 20 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 stated that later in the conversation [the defendant]
 pointed at a Buncombe County Sheriff’s Office patch
 affixed to his shirt and said the comment, and made
 the comment that the patch could get him out of
 trouble. At the time of the defendant’s arrest, he
 was wearing clothing with a Buncombe County
 Sheriff’s Office patch affixed to it.
(9) On March the 27th, 2017, at 1:58 p.m. Officer Jordan
 with the Buncombe County Sheriff’s Department
 obtained a search warrant for GPS monitoring data.
 That search warrant was executed at 2:13 p.m. on
 the same day.
(10) At 7:59 p.m. Officer Jordan obtained a search
 warrant for the defendant’s residence at 95 Christy
 Lane. That search warrant was executed at 8:29
 p.m. the same day.
(11) Prior to obtaining the search warrant for GPS data,
 Detective Elkins contacted Joan McCurry with the
 Department of Public Safety Probation and Parole
 Office. Detective Elkins asked for GPS location data
 of the defendant.
(12) On or about March the 22nd, 2017, Ms. McCurry
 provided Detective Elkins verbal information that
 the defendant’s location points were clustered
 around points of interest in the investigation.
(13) After receiving a search warrant, Ms. McCurry
 provided a spreadsheet to Detective Jordan with
 detailed location records for the defendant’s
 electronic monitoring.
(14) Prior to locating the defendant as part of the traffic
 stop, officers went to the defendant’s residence
 searching for him in order to serve the outstanding
 communicating threats warrant. They looked into
 the window of a workshop outbuilding and saw
 bullets on a shelf of unknown type, brand, or caliber.
(15) Based on Officer Jordan’s training and experience
 and facts uncovered as part of law enforcement’s
 investigation, he articulated as part of both search
 warrants items that he was looking for that were

 - 21 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 relevant to the investigation and that would aid in
 the apprehension or conviction of a suspect, namely
 the defendant.
 (16) [T]he Secretary of the North Carolina Department of
 Public Safety has issued Administrative Memo
 01.14 10-13 dated October 24, 2013, and updated by
 Tip of the Month dated May 2016 directing that
 Probation and Parole release electronic monitoring
 information to law enforcement without the need for
 a court order.

¶ 46 The trial court then made the following conclusions of law:

 (1) Based on the foregoing findings of fact, the Court
 concludes as a matter of law that there was
 sufficient probable cause for the issuance of both
 search warrants.
 (2) [T]here has been no substantial violation of Chapter
 15A that warrants suppression, and, therefore, the
 defendant’s motion to suppress is denied.

¶ 47 At the suppression hearing on 3 February 2020, Sergeant Jordan testified that

 based on his “training and experience” he knows that “rounds are [typically] stored

 not only with the weapon, but also typically in the home of an individual.” He further

 testified based on his training and experience, information about a firearm, such as

 proof of purchase and documentation, is typically located in residences. Sergeant

 Jordan’s investigation uncovered the fact that Defendant had bullets of an unknown

 type on the shelf at his residence as well as casings head-stamped with “FC LUGER

 9 MM” found inside of his truck on 22 March 2017; Sergeant Jordan found casings

 matching the same description at the homicide scene of Bobby Pegg on 23 March

 - 22 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 2017. Based on these facts, Sergeant Jordan requested items from Defendant’s home

 in the search warrant which he and his team “believed probably existed at

 [Defendant’s] residence,” including bloodstain evidence, DNA evidence, electronic

 and telephonic communications, prescription drugs, controlled substances,

 photographs, weapons, and other types of evidence such as casings.

¶ 48 In light of Sergeant Jordan’s testimony and the affidavit itself, there was

 competent evidence to support the finding challenged by Defendant. See Cooke, 306

 N.C. at 134, 291 S.E.2d at 619. The trial court’s findings of fact were supported by

 competent evidence, and thus, conclusively binding on appeal. See id. at 134, 291

 S.E.2d at 619. Further, the trial court’s ultimate conclusions of law are supported by

 its findings of fact. See id. at 134, 291 S.E.2d at 619. Therefore, the trial court did

 not err in denying Defendant’s motion to suppress evidence from his residence.

 V. Motion to Suppress Evidence of Defendant’s Electronic Monitoring
 Data

¶ 49 In his second argument, Defendant contends the trial court erred in refusing

 to suppress electronic monitoring data and allowing the State to introduce the data

 at trial because DPS released Defendant’s electronic monitoring information to law

 enforcement without a court order, in violation of N.C. Gen. Stat. § 15-207. The State

 argues Defendant is not entitled to a new trial because: “(1) the evidence introduced

 was obtained pursuant to a court order; (2) the Secretary of [DPS] consented to

 - 23 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 disclosure of the evidence; (3) the evidence was not subject to suppression; and (4)

 officers would have sought a search warrant for the records regardless of any

 statutory violation.” As discussed below, we agree with the State that no plain error

 occurred at trial.

¶ 50 Here, Sergeant Jordan was investigating the death of Bobby Pegg. In the

 course of the investigation, Sergeant Jordan found out from Captain Elkins, who was

 also investigating Pegg’s death, that Defendant was a suspect and wore an electronic

 monitoring device. Sergeant Jordan and Captain Elkins spoke with McCurry about

 obtaining Defendant’s GPS information, and she provided the requested data

 verbally over the telephone. Sergeant Jordan subsequently prepared and executed a

 search warrant for the GPS data, which was located in the care, custody, and control

 of DPS, and he received that information pursuant to the search warrant.

¶ 51 Although Defendant filed a pre-trial motion to suppress the GPS data, he

 acknowledges he did not object to the introduction of GPS evidence during the trial

 on the basis DPS released privileged information to law enforcement without a court

 order. Rather, Defendant objected at trial on the grounds the witness testifying

 regarding the DPS records did not “lay the proper foundation that th[e] GPS

 communication device was working properly . . . .” See State v. Oglesby, 361 N.C. 550,

 554, 648 S.E.2d 819, 821 (2007) (“[A] trial court’s evidentiary ruling on a pretrial

 motion is not sufficient to preserve the issue of admissibility for appeal unless a

 - 24 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 defendant renews the objection during trial.”); see also N.C. R. App. P. 10(a)(1) (“In

 order to preserve an issue for appellate review, a party must have presented to the

 trial court a timely request, objection, or motion, stating the specific grounds for the

 ruling the party desired the court to make if the specific grounds were not apparent

 from the context.”). Thus, Defendant did not properly preserve the issue for appeal

 as to the trial court’s alleged statutory violation under N.C. Gen. Stat. § 15-207. See

 N.C. R. App. P. 10(a)(1). Therefore, we review the alleged statutory violation under

 the plain error standard. See N.C. R. App. P. 10(a)(4).

 [T]he plain error rule . . . is always to be applied cautiously
 and only in the exceptional case where, after reviewing the
 entire record, it can be said the claimed error is a
 fundamental error, something so basic, so prejudicial, so
 lacking in its elements that justice cannot have been done,
 or where [the error] is grave error which amounts to a
 denial of a fundamental right of the accused, or the error
 has resulted in a miscarriage of justice or in the denial to
 appellant of a fair trial or where the error is such as to
 seriously affect the fairness, integrity or public reputation
 of judicial proceedings or where it can be fairly said the
 instructional mistake had a probable impact on the jury’s
 finding that the defendant was guilty.

 State v. Odom, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (citing United States v.

 McCaskill, 676 F. 2d 995, 1002 (4th Cir. 1982) (internal quotation marks omitted).

¶ 52 N.C. Gen. Stat. § 15-207 creates a qualified privilege for:

 [a]ll information and data obtained in the discharge of
 official duty by any probation officer shall be privileged
 information, shall not be receivable as evidence in any

 - 25 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 court, and shall not be disclosed directly or indirectly to any
 other than the judge or to others entitled under this Article
 to receive reports, unless and until otherwise ordered by a
 judge of the court or the Secretary of Public Safety.

 N.C. Gen. Stat. § 15-207 (2019); see State v. Craft, 32 N.C. App. 357, 361, 232 S.E.2d

 282, 285, disc. rev. denied, 292 N.C. 642, 235 S.E.2d 63 (1977) (concluding the

 qualified privilege created by N.C. Gen. Stat. § 15-207 was inapplicable to case where

 “the items seized were not information and data”).

¶ 53 For multiple reasons, we reject Defendant’s argument the trial court erred in

 admitting his GPS data in this case. First, Defendant moved to suppress pursuant

 to N.C. Gen. Stat. § 15A-974 any evidence related to the search warrant seeking

 Defendant’s GPS data obtained from the monitoring device he was wearing. Under

 N.C. Gen. Stat. § 15A-974(a)(2), evidence must be suppressed if “[i]t is obtained as a

 result of a substantial violation of the provisions of [Chapter 15A].” N.C. Gen. Stat.

 § 15A-974(a)(2) (2019) (emphasis added). Thus, Section 15A-974(a)(2) does not

 provide a mechanism by which Defendant could allege evidence was obtained as a

 result of a substantial violation of Chapter 15, the chapter under which the

 controlling statute, N.C. Gen. Stat. § 15-207, is found.

¶ 54 Second, the qualified privileged belonged to DPS, and DPS waived that

 privilege by releasing data to law enforcement as to where Defendant traveled on 22

 March 2017. See Craft, 32 N.C. App. at 361, 232 S.E.2d at 285; see also State v. Hardy,

 - 26 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 293 N.C. 105, 126, 235 S.E.2d 828, 841 (stating a qualified privilege can be waived).

 Pursuant to DPS’s Administrative Memorandum 01.14.10-13 effective 24 October

 2013, DPS was allowed to “[p]rovide location information [of offenders subject to

 electronic monitoring] to law enforcement at their request.” The policy was re-

 published in DPS’s May 2016 Tip of the Month interoffice memorandum. Copies of

 both documents were admitted into evidence during the suppression hearing.

¶ 55 Lastly, McCurry, on behalf of DPS, complied with the search warrant in

 providing the data to law enforcement, and it was this data that was actually

 admitted at trial. Therefore, we conclude no plain error occurred at trial with respect

 to the admission of GPS data concerning Defendant. See Odom, 307 N.C. at 660, 300

 S.E.2d at 378.

 VI. Refusal to Allow Cross-Examination

¶ 56 In his third argument, Defendant contends the trial court erred by not allowing

 him to cross-examine Pegg’s niece, Riddle, regarding a Facebook message that Pegg

 sent his mother. He argues that if the message had “been properly allowed in

 evidence, it would have cast sufficient doubt upon the State’s case to have resulted in

 the jury having reached a different result.” We disagree.

¶ 57 “The trial court’s determination as to whether an out-of-court statement

 constitutes hearsay is reviewed de novo on appeal.” State v. Castaneda, 215 N.C.

 App. 144, 147, 715 S.E.2d 290, 293 (emphasis added), appeal dismissed, 365 N.C. 354,

 - 27 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 718 S.E.2d 148 (2011).

¶ 58 “Hearsay” is defined as “a statement, other than one made by the declarant

 while testifying at the trial or hearing, offered in evidence to prove the truth of the

 matter asserted.” N.C. Gen. Stat. § 8C-1, Rule 801 (2021). Hearsay is generally

 inadmissible. N.C. Gen. Stat. § 8C-1, Rule 802 (2021).

¶ 59 In this case, Riddle attempted to testify regarding a Facebook message sent by

 Pegg to his mother on 22 March 2017. Pegg’s message stated: “Knife to a gunfight it

 is. Heading to Haw Branch with a knife alone, but I saw Jared heading that way.

 Two birds, one stone or knife, whatever.” The trial court conducted a voir dire

 examination regarding the admissibility of testimony concerning Pegg’s message.

 The trial court ruled Riddle’s testimony regarding the Facebook message was hearsay

 because Riddle’s grandmother told her about the Facebook message. The trial court

 did not err in finding Riddle’s testimony about the Facebook message was hearsay

 because the evidence was being offered for the truth of the matter asserted—to show

 Pegg headed to Haw Branch to partake in a fight on the day he was murdered. See

 N.C. Gen. Stat. § 8C-1, Rules 801. Therefore, the proposed testimony was

 inadmissible. See N.C. Gen. Stat. § 8C-1, Rule 802.

¶ 60 Defendant relies on State v. McElrath in support of his argument that the trial

 court erred in excluding the Facebook message. 322 N.C. 1, 366 S.E.2d 442 (1988).

 In McElrath, the trial court refused to admit into evidence the defendant’s exhibit

 - 28 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 which was a “drawing found by law enforcement officers among the victim’s personal

 effects [including] a rough map of the area surrounding [the] defendant’s North

 Carolina home and numerous written notations indicating a possible larceny scheme”

 targeting the defendant’s home. Id. at 11, 366 S.E.2d at 448. The defendant also

 offered evidence to show the victim had argued with several other persons and left

 with those persons on the date that the victim disappeared. Id. at 6–7, 366 S.E.2d at

 443. Our Supreme Court held that the trial court erred in refusing to admit the

 document because it “was relevant to a crucial issue in th[e] case,” and the defendant

 met his burden to show the error was prejudicial. Id. at 14, 366 S.E.2d at 449–50.

¶ 61 Defendant argues “this case is the same as McElrath,” and had the trial court

 admitted the Facebook message, “it would have cast sufficient doubt upon the State’s

 case to have resulted in the jury having reached a different result; thus, he contends

 the error was prejudicial. We disagree with Defendant’s assessment.

¶ 62 We have previously held:

 [t]he rule of relevancy for evidence of [guilt of one other
 than the defendant] is that it must do more than cast doubt
 over the defendant’s guilt merely because it is possible
 some other person could have been responsible for the
 crime with which he has been charged.

 Evidence that another committed the crime for which the
 defendant is charged generally is relevant and admissible
 as long as it does more than create an inference or
 conjecture in this regard. It must point directly to the guilt
 of the other party. Under Rule 401[,] such evidence must

 - 29 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 tend both to implicate another and be inconsistent with the
 guilt of the defendant.

 State v. Israel, 353 N.C. 211, 217, 539 S.E.2d 633, 637 (2000).

¶ 63 In this case, the Facebook message indicates Pegg may have headed to Haw

 Branch at some time on 22 March 2017 with the intention to fight an undisclosed

 person; however, Pegg’s message does no “more than cast doubt over [D]efendant’s

 guilt merely because it is possible some other person could have been responsible for

 the crime; it does not “point directly to the guilt of [another] party.” See Israel, 353

 N.C. at 217, 539 S.E.2d at 637. This conclusion is particularly bolstered given Pegg

 was murdered while he was sitting on his living room couch, and the State’s evidence

 tends to show the bullets and shell casings found at Pegg’s home matched bullets in

 Defendant’s possession and were fired from a gun that was in Defendant’s possession.

 Furthermore, the record tends to show Defendant was at the address of Pegg’s house

 on 22 March 2017 during a time when the offense could have been committed and

 after Pegg was last seen alive. Unlike McElrath, Defendant in this case did not

 present any other evidence to cast doubt upon the State’s theory of the case; he solely

 created an inference that another person was responsible for Pegg’s death. See id. at

 217, 539 S.E.2d at 637. Thus, the proposed evidence is too remote and speculative to

 be relevant. See id. at 217, 539 S.E.2d at 637. Therefore, the trial court properly

 denied admitting Pegg’s Facebook message at trial.

 - 30 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 VII. Firearm Identification Evidence

¶ 64 In his fourth argument, Defendant contends that the trial court erred by

 allowing the State’s firearm expert to opine the empty, fired, shell casings; the 9mm

 fired, copper-jacket bullet; and the jacket fragment were all fired from the same

 Cobray firearm on the basis her opinion lacked a proper foundation. He further

 contends Wilson did not testify as to how she applied the principles and methods she

 normally uses in examining firearms and bullets to this case. The State argues

 Wilson’s “extensive testimony showed the principles and methods used by her in

 identifying the murder weapon were reliable.” For the following reasons, we agree

 with the State.

¶ 65 Defendant acknowledges that he failed to object to the admission of Wilson’s

 expert testimony at trial, but nevertheless argues the trial court committed plain

 error by allowing her testimony.

¶ 66 “Under the plain error rule, [the] defendant must convince this Court not only

 that there was error, but that absent the error, the jury probably would have reached

 a different result.” State v. Griffin, 268 N.C. App. 96, 99, 834 S.E.2d 435, 437 (2019)

 (citation omitted).

¶ 67 N.C. Gen. Stat. § 8C-1, Rule 702 provides:

 (a) [i]f scientific, technical or other specialized
 knowledge will assist the trier of fact to understand the
 evidence or to determine a fact in issue, a witness qualified

 - 31 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 as an expert by knowledge, skill, experience, training, or
 education, may testify thereto in the form of an opinion, or
 otherwise, if all of the following apply:

 (1) The testimony is based upon sufficient
 facts or data.
 (2) The testimony is the product of reliable
 principles and methods.
 (3) The witness has applied the principles and
 methods reliably to the facts of the case.

 N.C. Gen. Stat. § 8C-1, Rule 702(a) (2019); see State v. McGrady, 368 N.C. 880, 889–

 90, 787 S.E.2d 1, 8–9 (2016). As we explained in State v. McPhaul, “[t]he precise

 nature of the reliability inquiry will vary from case to case depending on the nature

 of the proposed testimony.” 256 N.C. App. 303, 313, 808 S.E.2d 294, 303 (2017), disc.

 rev. improvidently allowed, 371 N.C. 467, 818 S.E.2d 102 (2018). “[A] trial court’s

 ruling on the admissibility of expert testimony will not be reversed on appeal absent

 a showing of abuse of discretion.” State v. Godwin, 369 N.C. 605, 610–11, 800 S.E.2d

 47, 51 (2017) (internal quotation marks omitted).

¶ 68 The State cites to State v. Griffin to argue Wilson’s testimony was proper, and

 the trial court did not commit plain error with respect to the admission of her

 testimony. 268 N.C. App. 96, 834 S.E.2d 435 (2019). In Griffin, our Court rejected

 the defendant’s contention that the trial court plainly erred where the expert witness

 testified:

 (1) she was formally educated and trained in forensic
 science and in the field of firearms examination;

 - 32 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 (2) she tested and analyzed the firearm, bullets, and
 cartridge casings in keeping with the procedures and
 methods learned during her specialized training in
 firearms examination;
 (3) her tests generated data, which she analyzed and
 used to form an opinion on whether or not the bullets
 and casings came from the recovered firearm; and
 (4) the data and conclusion were described in a written
 report and subsequently peer-reviewed by one of
 [her] colleagues in the Firearms Unit.

 Id. at 108, 834 S.E.2d at 441. Furthermore, the expert witness testified on cross-

 examination as to national standards set for firearms examination as well as reports

 and studies conducted in the field of firearms analysis. Id. at 108, 834 S.E.2d at 442.

 We concluded the testimony of the expert witness “show[ed] that her opinion was the

 product of reliable principles and methods, and that she reliably applied the

 principles and methods to the facts of the case”; thus, we held the trial court did not

 abuse its discretion or commit plain error in admitting her testimony. Id. at 109, 834

 S.E.2d at 442.

¶ 69 In the instant case, Wilson was tendered as an expert in the area of firearms

 identification and examination without objection upon testifying regarding her

 formal education and training. According to Wilson, after receiving a master’s degree

 in forensic science, she completed a two-year in-house training program in the

 firearms section of the North Carolina State Crime Lab. She was a firearms examiner

 for the North Carolina State Crime Lab from 2011 to 2017. The training involved

 - 33 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 both written and practical components, and consisted of a wide range of study topics,

 including: the history of firearms, ammunition, mechanics of firearms, disassembling

 and reassembling multiple types of firearms, safety features, the manufacture of

 firearms, microscopic comparisons, class characteristics, individual characteristics,

 serial number restorations, and distance determinations. The training also included

 a final, practical competency examination involving forensic firearm identification.

¶ 70 Wilson worked as a firearms examiner for the Minnesota Bureau of Criminal

 Apprehension since January of 2018. The number of comparisons she has performed

 as a firearms examiner “go[es] into the thousands.” Wilson had testified as an expert

 in firearms examination and identification in North Carolina courts approximately

 twenty-five times.

¶ 71 When asked by the State what makes forensic firearm identification possible,

 Wilson testified:

 The identification is possible because of the marks that are
 imparted onto a firearm during the manufacturing process.
 During the manufacturing process, a manufacturer will
 make some choices about what kind of firearm they’re
 going to manufacture, and there are some characteristics
 that they choose and they select. Examples of that would
 be the number of lands and grooves that they are going to
 put inside a barrel. Those are raised and lowered portions
 on the inside of the barrel that grip the bullet and they
 twist to the right or the left, and that’s what imparts spin
 and stability onto the bullet.

 So a manufacturer may choose that they want five lands

 - 34 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

and grooves and they’re going to twist to the right, or they
may opt to have six lands and grooves and twist to the left.
Those are class characteristics. So those are more broad
and could apply to multiple firearms, multiple models, et
cetera.

Another example would be the shape of the firing pin that
they are going to manufacture for that firearm. It may be
hemispherical. It may be elliptical. These are all decisions
that are made prior to the manufacturing process, and
these are the class characteristics, or a much broader group
of characteristics.

Additionally, during the manufacturing process, but not
controlled by the manufacturer, are the individual
characteristics. These are aspects of the firearm that are
unique to that particular firearm, and it’s because of the
manufacturing process, it’s because of the tools that are
used to manufacture, and the mechanisms used to
manufacture.

During the manufacturing process, the tools used to
manufacture the firearms are stronger. That’s how they’re
able to cut away from basically a steel tube and turn it into
a barrel. But during this process, the tools themselves will
change to a small degree. Think of it as a piece of
sandpaper on wood. As you brush the sandpaper on the
wood, the sandpaper is removing particles of that wood.
But over time that sandpaper also changes such that it gets
dulled and eventually has to be replaced. It’s that same
aspect with the manufacturing of firearms. So those tools
will change, and therefore, they’re imparting different
marks onto the firearms, one from the next. And then, as
well, the tools have to be changed or resharpened as they
dull.

The other way that firearms can take on individual
characteristics is after they leave the manufacturer,
through use, through abuse, through rust, corrosion; all of

 - 35 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 those aspects can create individual characteristics.

 Those individual characteristics are useful for the
 comparative process when they are reproducible, meaning
 that they are copied into multiple bullets or multiple
 cartridge cases. As a firearms examiner, I’m looking for
 that detail that can be seen, that gets copied onto the
 cartridge cases or onto the bullets, for example, from the
 firearm.

¶ 72 Wilson then testified regarding the process by which she typically examines a

 firearm when it comes into her office:

 Initially, I would examine the firearm looking for any
 damaged or missing components, looking at just the overall
 condition of the firearm. I’m going to do a function test on
 the firearm. That’s going to include examining all the
 safety features that are present and testing them to see if
 they are functioning properly. That also includes a trigger-
 pull determination, which is a measurement of how much
 weight has to be applied to the trigger in order for the
 firearm to fire. And then as the final step of the function
 test, the firearm is test fired. That is where ammunition is
 placed into the firearm. This is laboratory ammunition,
 typically, and the firearm is test fired. So the trigger is
 pulled, the firearm is fired, and the cartridge case and
 bullets are collected.

 Test firing is generally done in a water tank, which is a big
 steel tank full of water. And by shooting into this tank of
 water, it slows down the projectiles, the bullets, such that
 you can retrieve those bullets, and they are in a pristine or
 near pristine condition for any future comparisons in the
 case, and this also serves as the last step of the function
 exam to show that the firearm is capable of firing.

¶ 73 Next, Wilson testified that she performed the tests described above on the

 - 36 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

Ruger 9-millimeter and Cobray 9-millimeter that she examined and had the following

exchange with the State prosecutor regarding her findings:

 [Wilson]: [t]he K-1 Cobray pistol functions properly and
 has a single action trigger pull greater than
 four pounds, but less than or equal to five
 pounds.

 The K-2 Ruger pistol functions properly. The
 K-2 Ruger pistol has a single action trigger
 pull greater than five pounds, but less than or
 equal to six pounds and a double action
 trigger pull greater than 11-and-a-half
 pounds, but less than or equal to 13 pounds.

 [State]: And so did both of those firearms fire
 properly?

 [Wilson]: Yes, that’s correct.

 [State]: And as part of your firearms examination do
 you look at – you said you examine the
 firearm itself; is that right?

 [Wilson]: Yes.

 [State]: Do you ever examine the firing pin on these
 weapons?

 [Wilson]: Yes.

 [State]: Was there anything that you noticed about
 the firing pin on either of these items?

 [Wilson]: Yes. As a part of looking at the class
 characteristics, I note the – for examination
 purposes if it’s going to be used for
 comparison, then I will look at the shape of

 - 37 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 the firing pin to see if that is in agreement on
 class characteristics to anything else that I
 would be comparing it to.

 [State]: And did you examine the firing pin on the
 Ruger 9 millimeter?

 [Wilson]: I did not end up comparing the Ruger 9
 millimeter to anything in this case. So I did
 not specifically examine the firing pin.

 [State]: Did you examine the firing pin on the Cobray?

 [Wilson]: Yes, I did.

 [State]: And what, if anything, did you notice about
 the firing pin on the Cobray?

 [Wilson]: I noted that it left a rectangular shaped firing
 pin impression when firing.

 [State]: And based on your training and experience in
 the time you’ve been doing firearms
 examinations, is there anything unique about
 a rectangular firing pin?

 [Wilson]: That is extremely uncommon for a center fire
 firearm, that would be a firearm that hits the
 cartridge in the center. While rectangular
 firing pins are common for your rim-fire
 caliber firearms, such as your .22 caliber
 firearms, they are not common for the center-
 fire firearms such as a 9 millimeter Luger
 pistol.

¶ 74 Wilson went on to testify regarding how she performs a comparison test:

 A comparison examination is going to be conducted using a
 comparative microscope. This is a microscope that has a

 - 38 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 single eyepiece, but it has two separate stages. So you can
 put one item on one stage and a separate item on the other
 stage. And when you look through the eyepiece you are
 able to see both items simultaneously. So you can lay them
 side-by-side and do essentially, a microscopic comparison
 between those two.

 For the purposes of firearms examination, first what I’ll do
 is I’ll look at those test fired bullets or cartridge cases that
 I acquired through the test firing process. I’m looking at
 those to see what kind of detail is replicating and suitable
 for comparison purposes.

 When we do comparative examinations, first we look at
 those class characteristics. So those, as I spoke of earlier,
 are a more broad category of characteristics. We group
 items based off of those class characteristics. If all the
 discernible class characteristics are in agreement, then we
 continue the examination using the comparative
 microscope on individual characteristics. However, if there
 is a difference in the class characteristics, such as a bullet
 has five land and groove impressions, but the firearm
 submitted for comparison has six land and groove
 impressions, or lands and grooves . . . then that is a
 difference in class characteristics, and that bullet could not
 have been fired by that firearm, and therefore, it is
 eliminated and the examination is completed at that time.

 But if those class characteristics are all in agreement, then
 we move on to the individual comparison, and that is done
 through the comparative microscope.

¶ 75 Wilson testified she applied the methods and principles of comparison testing,

 described above, to the items that were received in this case, including the firearms,

 shell casings, bullets, and projectiles. Based on the data, she prepared a report of her

 examinations. Wilson concluded items Q-1, Q-2, Q-3, Q-4, Q-5, Q-6, and Q-7, the

 - 39 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 silver-colored spent shell casings found around Pegg’s body, were all fired from the

 K-1 Cobray pistol. Item Q-13, a one caliber .38 class fired copper jacket collected from

 Pegg’s jaw, “was determined to have been fired from the same firearm as the Q-8

 bullet, the Q-11 jacket fragment [found embedded in wood inside Pegg’s home], and

 the Q-15 bullet. And the Q-13 jacket was fired from the K-1 Cobray pistol.” Item Q-

 15, a one caliber .38 class fired copper-jacketed bullet collected from Pegg’s jaw, “was

 fired from the same firearm as the Q-8 bullet, the Q-11 jacket fragment, and the Q-

 13 jacket. And the Q-15 bullet was fired from the K-1 Cobray pistol.”

¶ 76 On cross-examination, Wilson testified regarding ammunition and the type of

 ammunition she used in performing the comparison tests in the instant case. She

 further testified it was not possible that two different weapons fired the rounds she

 examined.

¶ 77 Like the expert witness’s testimony in Griffin, Wilson’s testimony

 demonstrates it was “based upon sufficient facts or data” and “is the product of

 reliable principles and methods.” See N.C. Gen. Stat. § 8C-1, Rule 702(a); Griffin,

 268 N.C. App. at 108, 834 S.E.2d at 442. We conclude Wilson’s testimony shows she

 “applied the principles and methods reliably to the facts of the case.” See N.C. Gen.

 Stat. § 8C-1, Rule 702(a). Therefore, we hold the trial court did not plainly err by

 admitting Wilson’s expert testimony.

 VIII. Motion to Dismiss the First Degree Murder Charge

 - 40 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

¶ 78 In his final argument, Defendant argues the trial court erred in denying his

 motion to dismiss the charge of first degree murder. Specifically, Defendant contends

 the State’s evidence was insufficient to show malice, premeditation, and deliberation

 or that he committed the killing. We disagree.

 We review the trial court’s denial of a motion to dismiss de
 novo. A motion to dismiss for insufficient evidence is
 properly denied if there is substantial evidence (1) of each
 essential element of the offense charged, or of a lesser
 offense included therein, and (2) of defendant’s being the
 perpetrator of such offense. Substantial evidence is such
 relevant evidence as a reasonable mind might accept as
 adequate to support a conclusion. All evidence, both
 competent and incompetent, and any reasonable inferences
 drawn therefrom, must be considered in the light most
 favorable to the State. Additionally, circumstantial
 evidence may be sufficient to withstand a motion to dismiss
 when a reasonable inference of defendant’s guilt may be
 drawn from the circumstances. If so, it is the jury’s duty to
 determine if the defendant is actually guilty.

 State v. Blakney, 233 N.C. App. 516, 518, 756 S.E.2d 844, 846 (2014) (citation

 omitted). “The State is entitled to every reasonable inference to be drawn from the

 evidence. Contradictions and discrepancies do not warrant dismissal of the case;

 rather, they are for the jury to resolve. Defendant’s evidence, unless favorable to the

 State, is not to be taken into consideration.” State v. Franklin, 327 N.C. 162, 172,

 393 S.E.2d 781, 787 (1990) (citations omitted).

¶ 79 To convict a defendant of first degree murder under N.C. Gen. Stat. § 14-17,

 “the State must prove: (1) an unlawful killing; (2) with malice; (3) with the specific

 - 41 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 intent to kill formed after some measure of premeditation and deliberation.” State v.

 Peterson, 361 N.C. 587, 595, 652 S.E.2d 216, 223 (2007), cert. denied, 552 U.S. 1271,

 128 S. Ct. 1682, 170 L. Ed. 2d 377 (2008).

¶ 80 “[T]o overcome a motion [to dismiss in a murder case] and justify a conviction

 of the defendant, the State must offer evidence from which it can be reasonably

 inferred (1) that deceased died by virtue of a criminal act, and (2) that the act was

 committed by the defendant.” State v. Lee, 294 N.C. 299, 302, 240 S.E.2d 449, 451

 (1978) (citations omitted). “In order for the trial court to submit a charge of first

 degree murder to the jury, there must have been substantial evidence presented from

 which a jury could determine that the defendant intentionally . . . killed the victim

 with malice, premeditation and deliberation.” State v. Corn, 303 N.C. 293, 296, 278

 S.E.2d 221, 223 (1981).

¶ 81 Here, the parties do not dispute Pegg “died by virtue of a criminal act”; thus,

 we turn to the issue of whether the act was committed by Defendant. See Lee, 294

 N.C. at 302, 240 S.E.2d at 451.

 C. Substantial Evidence of Defendant as the Murderer

¶ 82 Our Courts have considered factors such as “proof of motive, opportunity,

 capability, and identity” when determining whether the evidence shows that a

 particular person committed a particular crime. State v. Bell, 65 N.C. App. 234, 238,

 309 S.E.2d 464, 467 (1983), aff’d, 311 N.C. 299, 316 S.E.2d 72 (1984). Although these

 - 42 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 factors are not essential elements of first degree murder, they “are circumstances

 which are relevant to identify an accused as the perpetrator of a crime.” Id. at 238,

 309 S.E.2d at 467. “[W]here the evidence is sufficient only to raise a suspicion or

 conjecture as to either the commission of the offense or the identity of the defendant

 as the perpetrator of it, the motion to dismiss should be allowed.” State v. Hayden,

 212 N.C. App. 482, 484, 711 S.E.2d 492, 494 (2011) (citation and internal quotation

 marks omitted).

¶ 83 Relying on North Carolina Supreme Court cases of State v. Cutler, 271 N.C.

 379, 156 S.E.2d 679 (1967), State v. White, 293 N.C. 91, 235 S.E.2d 55 (1977), State

 v. Lee, 294 N.C. 299, 240 S.E.2d 449 (1978), State v. Jones, 280 N.C. 60, 184 S.E.2d

 862 (1971), and State v. Hood, 77 N.C. App. 170, 334 S.E.2d 421 (1985), Defendant

 argues the State’s circumstantial evidence was insufficient to show he committed the

 murder.

¶ 84 In State v. Cutler, the Court held that there was insufficient evidence to

 establish that the defendant had an opportunity to commit the crime charged,

 although it could be reasonably inferred from the evidence that the defendant was at

 the home of the deceased around the time the victim died. 271 N.C. at 383, 156 S.E.2d

 at 682.

¶ 85 In State v. White, the Court held that the State had established that the

 defendant had an opportunity to commit the crime charged, but there was no other

 - 43 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 evidence of the defendant’s guilt. 293 N.C. at 97, 235 S.E.2d at 59.

¶ 86 In State v. Lee, the Court held the defendant’s motion to dismiss was

 erroneously denied because the “State failed to offer substantial evidence that the

 defendant was the one who shot [the victim]” despite any “inference that the

 “defendant bore malice toward [the victim].” 294 N.C. at 302–03, 240 S.E.2d at 451.

¶ 87 In State v. Jones, the Court reversed a trial court’s grant of the defendant’s

 motion to dismiss. 280 N.C. at 67, 184 S.E.2d at 866. The State presented evidence

 sufficient to show the defendant had an opportunity to commit the crime, but the

 “State failed to offer substantial evidence that [the] defendant was the one who shot

 his wife” to link the empty cartridges found in the defendant’s pocket to the bullets

 that killed the victim. Id. at 65–67, 184 S.E.2d at 865–66.

¶ 88 Finally, in State v. Hood, the Court held that “neither motive nor opportunity”

 could be reasonably inferred from the evidence of the case. 77 N.C. App. at 173, 334

 S.E.2d at 423 (emphasis omitted). A witness heard a gunshot fired in the direction

 of the victim’s residence and then saw the defendant drive away. Id. at 173, 334

 S.E.2d at 423. The Court noted that “[t]here [was] no evidence that [the] defendant

 had access to the [victim’s residence] or that he otherwise gained entrance to it. There

 [was] no evidence that [the] defendant was armed or that the deceased was present

 in [his residence] at the time.” Id. at 173, 334 S.E.2d at 423.

¶ 89 The above cases are distinguishable from the instant case where there is

 - 44 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 substantial evidence Defendant had the opportunity to commit the crime and was

 capable of doing so. See Bell, 65 N.C. App. at 238, 309 S.E.2d at 467. Furthermore,

 there is substantial evidence that Defendant possessed the murder weapon as well

 as the same ammunition that was used to shoot Pegg, and he was armed at a time

 when a reasonable jury could find Defendant committed the crime. See Jones, 280

 N.C. at 67, 184 S.E.2d at 866. Finally, the record shows Pegg’s house was unlocked

 when he was at home; Defendant could have easily gained entrance to the home given

 it was unlocked, and Defendant was presumably familiar with the home given the

 prior work he performed at the house. See Hood, 77 N.C. App. at 173, 334 S.E.2d at

 423. We now discuss Defendant’s opportunity and capability of committing the

 murder of Pegg.

 1. Opportunity

¶ 90 Defendant argues there is “absolutely no evidence of . . . opportunity” in this

 case. The State contends there is sufficient evidence to show Defendant had the

 opportunity as well as the means to commit murder.

¶ 91 “In order for this Court to hold that the State has presented sufficient evidence

 of [the] defendant’s opportunity to commit the crime in question, the State must have

 presented at trial evidence not only placing the defendant at the scene of the crime,

 but placing him there at the time the crime was committed.” Hayden, 212 N.C. App.

 at 488, 711 S.E.2d at 497.

 - 45 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

¶ 92 In this case, the State’s evidence showed Defendant’s electronic monitoring

 device placed Defendant in the vicinity of Pegg’s home and at the scene of the crime

 on 22 March 2017—one day before the deceased body was found and on the same day

 Pegg was last seen alive, and at a time when a reasonable jury could find the crime

 could have been committed. See State v. Miles, 222 N.C. App. 593, 601, 730 S.E.2d

 816, 823 (2012) (holding testimony that the defendant was seen at the victim’s house

 coupled with phone records pinpointing the defendant to the vicinity of the victim’s

 home and site of the crime established the defendant had the opportunity to commit

 the murder in light of the State’s evidence as a whole), aff’d, 366 N.C. 503, 750 S.E.2d

 833 (2013).

¶ 93 Additionally, the State presented the testimony of Carson, whom Defendant

 told he, “was going up the road to take care of some business,” while Defendant was

 located on the same road as the victim’s house. Defendant made his statement after

 he showed Carson a firearm matching the description of the murder weapon.

 Considering the evidence in the light most favorable to the State, a reasonable jury

 could conclude that Defendant was in the vicinity of Pegg’s home and the scene of the

 crime at the time of Pegg’s death, which would establish Defendant had the

 opportunity to commit the murder. See Blakney, 233 N.C. App. at 518, 756 S.E.2d at

 846.

 2. Capability

 - 46 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

¶ 94 Our courts have held evidence of opportunity by itself is insufficient to carry a

 first degree murder case to the jury. See Bell, 65 N.C. App. at 238–39, 309 S.E.2d at

 467. Thus, we next consider whether Defendant was capable of committing the

 murder. See id. at 238, 309 S.E.2d at 467.

¶ 95 In the instant case, silver-colored shell casings with the headstamp of FC

 LUGER 9 MM found around the victim’s body matched the ammunition that was

 found in Defendant’s truck by law enforcement on 22 March 2021, shortly after

 Defendant was in the vicinity of Pegg’s home, based on GPS data provided at trial.

 The search of Defendant’s truck and home also revealed Defendant possessed

 multiple guns, one of which was later determined to be the murder weapon. Thus,

 the record contains sufficient evidence to permit a reasonable jury to find he had the

 capability to commit first degree murder. See Lee, 294 N.C. at 302, 240 S.E.2d at 451.

¶ 96 Although the State’s evidence was solely circumstantial in this case, the

 evidence did more than “raise a suspicion or conjecture as to . . . the identity of

 [D]efendant as the perpetrator of it.” See Hayden, 212 N.C. App. at 484, 711 S.E.2d

 at 494. Rather, the evidence was sufficient to survive a motion to dismiss as a

 reasonable jury could infer Pegg’s death was a result of Defendant’s criminal act. See

 Blakney, 233 N.C. App. at 518, 756 S.E.2d at 846; Bell, 65 N.C. App. at 238, 309

 S.E.2d at 467. We hold there was substantial evidence that Pegg’s murder was

 committed by Defendant when we consider all of the evidence in the light most

 - 47 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 favorable to the State. See id. at 518, 756 S.E.2d at 846; Lee, 294 N.C. at 302, 240

 S.E.2d at 451.

 3. Motive, Premeditation, & Deliberation

¶ 97 Defendant asserts the State’s case failed to present substantial evidence of

 malice, premeditation, and deliberation. We disagree.

¶ 98 It is well-established by our Courts that “malice is presumed where the

 defendant intentionally assaults another with a deadly weapon, thereby causing the

 other’s death.” State v. Leazer, 353 N.C. 234, 238, 539 S.E.2d 922, 925 (2000) (citation

 omitted). “Premeditation means that the act was thought over beforehand for some

 length of time; however, no particular amount of time is necessary for the mental

 process of premeditation.” State v. Trull, 349 N.C. 428, 509 S.E.2d 178 (1998), cert.

 denied, 528 U.S. 835, 120 S. Ct. 95, 145 L. Ed. 2d 80 (1999). “Deliberation means an

 intent to kill carried out by the defendant in a cool state of blood, in furtherance of a

 fixed design for revenge or to accomplish an unlawful purpose and not under the

 influence of a violent passion, suddenly aroused by lawful or just cause or legal

 provocation.” State v. Hamlet, 312 N.C. 162, 170, 321 S.E.2d 837, 842–43 (1984)

 (citation omitted). “The phrase ‘cool state of blood’ means that the defendant’s anger

 or emotion must not have been such as to overcome the defendant’s reason.” Id. at

 170, 321 S.E.2d at 843 (citation omitted).

¶ 99 “Premeditation and deliberation are mental processes which are ordinarily not

 - 48 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 susceptible to proof by direct evidence.” State v. Olson, 330 N.C. 557, 565, 411 S.E.2d

 592, 596 (1992). Our Supreme Court

 has identified several examples of circumstantial evidence,
 any one of which may support a finding of the existence of
 [premeditation and deliberation]: (1) absence of
 provocation on the part of the deceased, (2) the statements
 and conduct of the defendant before and after the killing,
 (3) threats and declarations of the defendant before and
 during the occurrence giving rise to the death of the
 deceased, (4) ill will or previous difficulties between the
 parties, (5) the dealing of lethal blows after the deceased
 has been felled and rendered helpless, (6) evidence that the
 killing was done in a brutal manner, and (7) the nature and
 number of the victim’s wounds.

 State v. Childress, 367 N.C. 693, 695, 766 S.E.2d 328, 330 (2014) (citation omitted).

¶ 100 Here, there is a presumption of malice given the evidence tends to show Pegg

 was intentionally killed with a deadly weapon. See Leazer, 353 N.C. at 238, 539

 S.E.2d at 925. There is also substantial evidence the killing was premeditated and

 deliberate. See Blakney, 233 N.C. App. at 518, 756 S.E.2d at 846; Childress, 367 N.C.

 at 695, 766 S.E.2d at 330. Pegg was found in a seated position on his couch with

 multiple gunshot wounds to his head. A reasonable jury could conclude Pegg did

 nothing to provoke Defendant. See State v. Rose, 339 N.C. 172, 195, 451 S.E.2d 211,

 224 (1994) (stating the victim’s position of sitting in a chair with a pillow or blanket

 on his chest indicated a lack of provocation on his part), cert. denied, 515 U.S. 1135,

 115 S. Ct. 2565, 132 L. Ed. 2d 818 (1995). The multiple shots fired support an

 - 49 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 inference of Defendant’s premeditation and deliberation. See State v. Taylor, 362

 N.C. 514, 533, 669 S.E.2d 239, 258 (2008), cert. denied, 558 U.S. 851, 130 S. Ct. 129,

 175 L. Ed. 2d 84 (2009). At around the time that a reasonable jury could infer the

 murder occurred, Defendant showed Carson a 9-millimeter firearm, consistent with

 the description of the murder weapon. He also told Carson he “had to go up the road

 to take care of some business.” A reasonable jury could infer that Defendant intended

 to travel up Dillingham Road to Pegg’s house to kill Pegg. See State v. Williams, 151

 N.C App. 535, 540, 566 S.E.2d 155, 159 (2002) (reasoning that bringing a revolver to

 a meeting indicated “some preparation and intent to do [the victim] harm”).

¶ 101 The evidence tends to show Defendant fired three shots into Pegg’s head, two

 of which were discharged at close range. This indicates Pegg was shot after he had

 been felled and rendered unconscious, and he was killed in a brutal manner. See

 Childress, 367 N.C. at 695, 766 S.E.2d at 330. In light of such evidence, we hold there

 was substantial evidence of premeditation and deliberation; thus, the trial court did

 not err in denying Defendant’s motion to dismiss the charge of first degree murder

 and submitting the charge to the jury. See Blakney, 233 N.C. App. at 518, 756 S.E.2d

 at 846; Corn, 303 N.C. at 296, 278 S.E.2d at 223.

 IX. Conclusion

¶ 102 We hold the trial court did not err in denying Defendant’s motion to suppress

 any evidence seized during the search of his residence because the affidavit was

 - 50 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

 sufficient on its face. Further, the trial court’s findings of fact are supported by

 competent evidence, and its conclusions of law are supported by findings of fact in its

 order on the motion to suppress. The trial court did not commit plain error by denying

 Defendant’s motion to suppress any evidence of Defendant’s electronic monitoring

 data because Defendant did not cite to a statutory mechanism allowing him to

 suppress such evidence, DPS waived its privilege with respect to the data by verbally

 releasing it to law enforcement, and the GPS evidence actually admitted at trial was

 the product of law enforcement’s search warrant.

¶ 103 The trial court did not err by disallowing the State’s witness to testify

 concerning the murder victim’s Facebook message because it was hearsay. Even if

 the message was offered for a non-hearsay purpose, Defendant failed to show the

 message was relevant because he did no more than create an inference as to another

 person’s guilt of the crime. The trial court did not plainly err in admitting testimony

 of the State’s expert witness on firearm identification and examination because her

 testimony met the requirements under N.C. Gen. Stat. § 8C-1, Rule 702(a). Lastly,

 the trial court did not err in denying Defendant’s motion to dismiss because the State

 presented substantial evidence that Defendant committed the murder, and that he

 acted with malice, premeditation, and deliberation. Accordingly, we conclude

 Defendant received a fair trial, free of prejudicial error.

 NO ERROR.

 - 51 -
 STATE V. GALLION

 [do not modify this line]

 Opinion of the Court

Judges TYSON and GORE concur.

 - 52 -